UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW BALANCE ATHLETIC SHOE, INC.,

     Plaintiff,

     v.

CONVERSE INC.,

     Defendant.

Civil Action No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT

1.     Plaintiff New Balance Athletic Shoe, Inc. ("New Balance") owns PF FLYERS, a famous athletic footwear brand whose shoes are comprised of a canvas upper, toe bumper, toe cap, and striped midsole.  New Balance acquired PF Flyers in 2001, but the brand and accompanying designs have generally been available in the marketplace since at least as early as the 1940s.  Defendant Converse Inc. ("Converse") sells CHUCK TAYLOR ALL STARS brand athletic footwear that are comprised of design elements similar to the PF FLYERS.  Converse Chuck Taylors have likewise been available for a very long time.

| PF Flyers | Converse |
|:---:|:---:|



2.      This case concerns Converse's recent aggressive efforts to protect its alleged rights in a product configuration trademark purportedly comprised of the combination of a toe bumper, toe cap, and striped midsole on athletic footwear.  In connection with those efforts, Converse filed an action before the U.S. International Trade Commission on October 14, 2014, against numerous alleged infringers of its CHUCK TAYLOR ALL STAR brand footwear (the "ITC Action").  It also filed numerous federal court actions making similar claims against the same parties.

3.      New Balance was not named as a party in any of these enforcement actions.  A fair reading of the ITC complaint, however, reveals that Converse asserts trademark rights that, if upheld by the Commission, may improperly affect PF Flyers' ability to compete with Converse. Equally as troubling, Converse's ITC complaint seeks a "general exclusion order" that purports to target the named respondents, but is broadly written so as to also potentially exclude long-time legitimate competitors, such as PF Flyers.

4.      Given the parties' mutual standing in the athletic footwear industry and the absence of any consumer confusion between their products, New Balance reached out to Converse in an attempt to clarify and memorialize the scope of Converse's enforcement actions as excluding PF Flyers.  New Balance's concerns with the scope of Converse's enforcement actions were apparently well-founded.  Not only did Converse refuse to carve out PF Flyers, but it threatened to amend the ITC Action to add New Balance as a respondent and to otherwise seek to enjoin the sale of PF Flyers products.  Subsequent efforts to avoid this dispute have been unsuccessful.

5.      As set forth more fully below, New Balance seeks a declaratory judgment of non-infringement because Converse does not have the exclusive right to use a toe bumper, toe cap,

and striped midsole in connection with athletic footwear.  In addition, there can be no likelihood of confusion between New Balance's use of these non-source identifying elements and Converse's use of the same—indeed, there has been none over the past ten years or, to New Balance's knowledge, since the 1940s.

6.      Moreover, Converse acquired PF Flyers in the 1970s, but was eventually required to sell the brand in settlement of a Clayton Act antitrust investigation brought by the United States.  *See generally United States v. Converse Rubber Corp., et al.*, Civ. A. No. 72-2075-J, 1972 WL 595 (D. Mass. Aug. 29, 1972).  Shown below is a Converse advertisement from the 1970s for the same PF Flyers model shoe shown above that uses the combination of a toe bumper, toe cap, and striped midsole:



Converse's sale of the PF Flyers product line to a third-party approximately 40 years ago constitutes a ratification of the right to compete using the already historic PF Flyers footwear

designs, as well as acquiescence, estoppel, abandonment, or other equitable bar to any injunctive relief preventing their use.

7.      For these reasons, and those set forth below, use of the combination of a toe bumper, toe cap, and striped midsole in connection with athletic footwear elements in connection with PF Flyers branded athletic footwear does not and cannot constitute infringement of Converse's purported trademark.

8.      New Balance also seeks cancellation of Converse's recently acquired federal trademark registration for the combination of a toe bumper, toe cap, and striped midsole, U.S. Reg. No. 4,398,753, because the claimed features are either ornamental or functional and cannot serve as a source identifier, or at the very least, such features have not and cannot acquire secondary meaning.

## PARTIES

9.      New Balance Athletic Shoe, Inc. is a Massachusetts corporation with its principal place of business at 20 Guest Street, Boston, Massachusetts 02135.

10.     On information and belief, Defendant Converse is a Delaware corporation with its principal place of business at One High Street, North Andover, Massachusetts 01845.

## JURISDICTION AND VENUE

11.     This action arises and is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a declaration of the rights and/or other legal relations of the parties to this litigation with respect to an actual controversy arising under the trademark laws of the United States, 15 U.S.C. § 1051, *et seq.* This action also arises and is brought under the Lanham Act, 15 U.S.C. § 1119, seeking cancellation of Converse's federal trademark U.S. Reg. No.

3,258,103.  Thus, the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, and

2201.

14.     12.     This Court has personal jurisdiction over Converse as it is does continuous and

systematic business in Massachusetts and this District.  *See* MASS. GEN. LAWS ch. 223A, § 3.

13.     Venue is proper in the district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial

part of the events giving rise to this action occurred in this District and have caused damage to

New Balance in this District.

## FACTS

### New Balance and the PF FLYERS Brand

14.     New Balance is a private company that was founded in 1906.  Today, New

Balance is one of the largest athletic shoe companies in the world, with over 4,000 employees

and approximately $2 billion in annual sales worldwide in 2013.  It is the only major company

that manufactures athletic footwear in factories in the United States.

15.     Since its earliest days, New Balance has focused on fit and authenticity as its core

brand message.  New Balance is one of the few athletic footwear manufactures to make shoes in

true width sizing, rather than the more common narrow and wide.  Because of its brand qualities

New Balance has among the most brand-loyal customers in the marketplace.  New Balance won

the No. 1 Customer Loyalty Award in the athletic footwear category for eight consecutive years

from Brand Keys, an independent group that identifies the brands that are best able to engage

consumers and create loyal customers.

16.     New Balance acquired the PF FLYERS brand in 2001.  As described more fully

below, PF FLYERS is an iconic brand in the athletic footwear industry with a long history of

success.  For example, in 1958 PF Flyers released a model that was endorsed and worn by the

Boston Celtic and future Hall-of-Fame basketball star Bob Cousy.  In that year alone, PF Flyers sold 14,000,000 pairs of shoes.

17.     Since acquiring the brand, New Balance has spent millions of dollars marketing PF FLYERS brand shoes.  New Balance has focused on remaining true to the original shoe designs and branding the shoes consistent with their classic heritage.

18.     For example, in one marketing campaign PF Flyers collaborated with Ebbets Field Flannels, a well-known maker of authentic reproduction vintage sporting goods, to create a special Ebbets Field edition of PF Flyers Center-Hi shoe.  The collaboration was an enormous success and widely reported in the footwear and style press.

19.     These efforts have resulted in more than $50,000,000 in sales.  As a result, PF Flyers and the goodwill it represents has become a valuable asset of the company.

20.     PF Flyers shoes are sold with the famous PF FLYERS branding prominently shown in various places on the shoe (models vary) and accompanying packaging.  Converse does the same with its shoe:

| **PF FLYERS** | **CONVERSE ALL STAR** |
| :---: | :---: |
|  |  |



21.     PF Flyers' marketing also uses the famous PF FLYERS brand, emphasizes the brand's traditional green color, and generally employs a look and feel that is entirely different from Converse.

22.     For the last ten years, PF Flyers have competed directly with the Converse CHUCK TAYLOR ALL STAR brand shoes—just as they had historically for many decades.

On information and belief, the parties' shoes have been sold to the same consumers, through similar marketing and sales channels, and at comparable price points.

23.     During that time, Converse never indicated that PF Flyers footwear infringed Converse's claimed trademark in the combination of a toe cap, toe bumper, and striped midsole. It never raised any issue of actual or potential confusion among consumers.  Given their position in the athletic footwear industry, the parties have historically worked cooperatively to address business issues as they arise from time-to-time.  Despite this generally positive relationship, Converse said nothing about PF Flyers for ten years.

24.     In light of the foregoing, there is no likelihood of any consumer confusion between the parties' goods or any harm to Converse's claimed goodwill and New Balance is entitled to a declaration of non-infringement.

25.     New Balance also is entitled to a declaration that so long as PF Flyers products using a combination of a toe cap, toe bumper, and striped midsole bear PF FLYERS house marks, either on the footwear or in connection with its marketing or sale, the parties' products are sufficiently distinct so as to preclude any cognizable confusion or harm to goodwill.

## PF Flyers' Historic Use and Fame

26.     Athletic footwear comprised of a canvas upper combined with a toe cap, toe bumper, and striped midsole have been sold since at least as early as the 1940s.  PF Flyers were originally sold by B.F. Goodrich under the name "PF" for "Posture Foundation," deriving its name from an insert that supported the arch.  The shoes were among the first and most popular to use the combination of design elements at issue.



27.    The shoes were such a success that in 1944 a children's line was added and

eventually the "PF" brand became "PF Flyers":



28.    The shoe continued to be widely marketed and sold throughout the 1940s and

1950s.  In 1958 PF Flyers released its enormously successfully Bob Cousy shoe, which has been

credited as the first collaboration between a shoe company and a professional athlete.  Below is

an advertisement showing the construction of the high top model, including its toe cap, toe

bumper, and striped midsole:



29.     Between 1952 and 1963 sales peaked at 25,000,000 pairs annually and PF Flyers had approximately 20% of the sneaker market.

30.     PF Flyers continued to sell footwear using a toe cap, toe bumper, and striped midsole throughout the 1960s and into the early 1970s.  The footwear was heavily marketed during this time in print and on television, including advertising tie-ins with popular television shows such as the Mickey Mouse Club, American Bandstand, Bozo the Clown, and the popular cartoon, Johnny Quest.  In 1971 Hank Aaron's son was featured in a PF Flyers advertisement that prominently displayed the toe cap, toe bumper, and striped midsole.  *See generally* Exhibit A (sample PF Flyers advertising from the 1950s, 1960s, and 1970s).

31.     During this time the PF Flyers slogan "Run Faster and Jump Higher" became famous (and, even today, sports fans and sportscasters routinely reference the slogan by using the phrase "he's got his PF Flyers on").

32.     In the early 1970s, B.F. Goodrich sold PF Flyer to Converse.  Converse continued to sell PF Flyers with the toe cap, toe bumper, and striped midsole as shown in the advertisement above.  Shortly thereafter, the United States asserted claims against Converse under the Clayton Act and in 1972 it required Converse to sell PF Flyers to a third-party.

33.     Upon information and belief, Converse then sold PF Flyers to a new entity, PF Industries, Inc., which made PF Flyers for a period of time.  *See* Exhibit B.  Thereafter, the brand was sold to Brookfield Athletic Shoe Co., which was purchased by Hyde Athletic Industries.  LJO, Inc. acquired the brand in 1991 and, upon information and belief, began selling PF Flyers with the combination of a toe cap, toe bumper, and striped midsole.  *See* Exhibit C.  While a part of LJO, PF Flyers had an 85% consumer recognition factor according to a national survey.

34.     As described above, PF Flyers enjoyed wide-spread fame and made a long-standing continuous use of the combination of a toe cap, toe bumper, and striped midsole.  On information and belief, this fame and well-known use continues to influence consumer perception even today.  As a result, even putting aside New Balance's own more recent and consistent ten years of use, Converse cannot demonstrate that consumers exclusively associate the combination with Converse as source.

35.     In addition, Converse's sale of the PF Flyers business in response to the antitrust claim constitutes an implied or express acknowledgment of the right of the purchaser to continue to make shoes of the then existing PF Flyers designs.  At a minimum, these circumstances demonstrate that the then existing PF Flyers designs were not confusingly similar to Converse footwear bearing the now-claimed trademark.  As such, Converse's sale constitutes acquiescence, estoppel, abandonment, or other equitable bar to any injunctive relief preventing use of the same.

**Third Party Use of the Toe Cap, Toe Bumper, and Striped Midsole Combination**

36.    The absence of Converse's exclusive rights in the combination of design elements is further illustrated by the fact that over the years numerous other third parties also have used the combination of a toe cap, toe bumper, and striped midsole on substantially similar goods. For example:





37.     On information and belief, these shoes were sold in competition with the Converse CHUCK TAYLOR ALL STAR brand shoes and were sold to the same class of consumers, through similar marketing and sales channels, and at comparable price points for many years.

38.     Third-party shoes bearing the combination of a toe cap, toe bumper, and striped midsole (such as the above) continue to be sold in a robust secondary market for vintage canvas basketball shoes.

39.     On information and belief, Converse has long since recognized that the marketplace was comprised of third-party shoes bearing the combination of a toe cap, toe

bumper, and striped midsole.  Indeed, the marketplace was so saturated with shoes bearing the

combination that Converse ran advertisements acknowledging that the combination was not

source identifying and instructing consumers to look for the ALL STAR ankle patch to identify

footwear as coming from Converse.  For example:





40.     As a result of the foregoing, consumers (both historic and current) do not exclusively associate the combination of a toe cap, toe bumper, and striped midsole with Converse as source absent the presence of other indicators of source, such as the CONVERSE, CHUCK TAYLOR, ALL STAR, or other Converse-related trademarks.

41.     In addition, these and other third party uses, and Converse's tolerance of them for decades, constitute acquiescence, estoppel, abandonment, or other equitable bar to any injunctive relief preventing use of the combination of a toe cap, toe bumper, and striped midsole by third parties.

42.     Alternatively, given the nature of the marketplace, to the extent Converse can establish that present-day consumers associate the combination of elements with Converse, its rights are extremely narrow and limited to precisely the trademark as registered and no more.  In other words, even if Converse could prove protectable rights and an exclusive association (it cannot), its rights would not reach the use of a toe cap, toe bumper, and striped midsole generally, particularly where the use is accompanied by a famous and distinguishing house mark such as PF FLYERS.

### Converse's Registration

43.     Despite claiming a first use in commerce in the 1940s, Converse did not apply for a federal registration for the combination of a toe cap, toe bumper, and striped midsole until August 6, 2012.  The registration issued on September 10, 2013.

44.     Converse's trademark registration is specific in its claims.  It claims that "[t]he mark consists of the design of the two stripes on the midsole of the shoe, the design of the toe cap, the design of the multi-layered toe bumper featuring diamonds and line patterns, and the relative position of these elements to each other."  *See* U.S. Regis. No. 4,398,753.

45.     Despite this relatively narrow description, Converse also claims common law rights in a one *or* two midsole stripes in the ITC Action.  *See* ITC Complaint, ¶ 10 Dkt No. 3035; *id.* at p. 222.  In that action, it also asserts infringement against respondents whose footwear does not replicate the precise Converse design, but merely uses the combination of a toe cap, toe bumper, and striped midsole.

46.     Converse also recently asserted rights in the general combination of a toe cap, toe bumper, and striped midsole in a full page advertisement in a leading footwear industry trade journal, which also appeared on Twitter:



The Converse Chuck Taylor All Star



The combination of the toe cap, the toe bumper, and the two midsole stripes is a registered trademark of Converse Inc.

47.     The text at the bottom of the advertisement reads "The combination of the toe cap, the toe bumper, and the two midsole stripes is a registered trademark of Converse Inc." *See* Exhibit D.  This claim of rights is over broad as it relates to the trademark as described in the registration.

48.     Converse submitted its application under Section 2(f) of the Lanham Act. Reliance on Section 2(f) during prosecution presumes that the mark is descriptive.  Indeed, as a product configuration mark, the claimed mark *cannot* be inherently distinctive.  As a result, Converse's application requires proof of secondary meaning for its claimed mark to be registrable.

49.     For the reasons set forth above, the registration is subject to cancellation because Converse has no secondary meaning in the claimed trademark because in the minds of the public there is no exclusive association between the claimed trademark and Converse as source.

50.     The registration is also subject to cancellation because the evidence Converse publicly filed with the USPTO in support of a finding of secondary meaning is itself insufficient to carry it burden to show secondary meaning.

51.     The evidence submitted does not demonstrate the secondary meaning of the claimed trademark design—limited to the combination of the toe cap, toe bumper, and striped midsole—because in all of the examples of use provided the design *is accompanied by other indicators of Converse as source*.  In other words, every example of the use submitted is either use on a shoe bearing other Converse trademarks or in an advertisement that includes other Converse trademarks.  Converse submitted no evidence that the claimed mark has any *independent* source identifying quality when not accompanied by other indicators of Converse as source.

52.     In addition, the evidence submitted of Converse's marketing spend is insufficient because it does not even assert, much less demonstrate, that the marketing was targeted *at the claimed trademark design*, as opposed to the CONVERSE or CHUCK TAYLOR ALL STAR trademarks, or other attributes of the shoe.  The sample advertisements submitted by Converse include no "look-for" advertisements which point to the claimed design elements as source identifiers separate and apart from Converse's other marks.

53.     Likewise, the evidence submitted of Converse's sales is insufficient because it does not even assert, much less demonstrate, that the sales are attributable *to the claimed trademark design*, as opposed to the consumer appeal of the CONVERSE or CHUCK TAYLOR ALL STAR trademarks, or any other functional or aesthetic aspects of the footwear.

54.     Finally, the third-party commentary submitted concerns the renown of the shoe generally and does not address the independent source identifying aspect of the claimed trademark.

55.     As a result, the application by Converse to the USPTO was inadequate to carry its burden to show secondary meaning and the registration should be cancelled.

56.     In addition to the absence of secondary meaning, the registration is subject to cancellation because it is comprised of ornamental and functional elements that are not protectable as trademarks.  The prevalence of a toe cap and toe bumper across brands demonstrates that those elements are functional as protection for the toes, whether playing basketball or otherwise.  Indeed, Converse's own advertisements call out the functional aspects of the toe cap and toe bumper.  For example, one advertisement listed the "Rugged Protective Toe Guard" as one of ten ways the shoe was better than other brands, another listed the "Toe Protecting Guard – Double strength at a vital point" as one reason the shoes were nine ways

better than other brands, and another stated that the "Double Strength Toe Guard means longer wear" and included it among "features" that will "help your boys win games." *See* Exhibit E. These functional attributes apply equally today.

57.     Similarly, the striped outsole is merely ornamental insofar as it is decorative and not an essential attribute of the claimed combined elements comprising the registered trademark. In acknowledgment of the ornamental and non-source identifying role of the stripes, Converse sells CHUCK TAYLOR ALL STAR brand shoes that include the toe cap and toe bumper, but that *omit* the striped midsoles.  In addition, Converse permits consumers to eliminate the midsole stripes in on-line custom ordering of CHUCK TAYLOR ALL STAR brand shoes.  If the stripes truly acted as a trademark (*i.e.*, an indicator of source and not an ornament) Converse would not permit third-parties to eliminate them.  Indeed, the customization program does not permit the consumer to eliminate the CONVERSE ALL STAR heel patch or the ALL STAR badge on the ankle, which is consistent with their role as genuine source identifying trademarks.

58.     For these reasons, the Court should cancel U.S. Regis. No. 4,398,753.

### Converse's Threats to New Balance

59.     As described above, Converse filed its ITC Action on October 14, 2014.  In that action Converse requests that the Commission, among other things, issue a general exclusion order forbidding entry into the United States of footwear products that violate Converse's common law and federally registered rights in its CHUCK TAYLOR ALL STAR model footwear.  It also filed numerous federal court actions making similar infringement claims against the same parties.

60.     Thereafter, New Balance inquired with Converse concerning the proposed scope of its requested relief.  New Balance also provided Converse with a proposed coexistence agreement.

61.     In a meeting to discuss these issues on November 12, 2014, Converse's representative refused to accept the coexistence agreement and expressly threatened to amend the ITC Action to name New Balance as a respondent.  In addition, the representative indicated that Converse had recently reviewed the PF Flyers website and was of the opinion that PF Flyers shoes infringed Converse's claimed trademark rights.

62.     Since that time the parties engaged in several additional attempts to avoid this dispute through a negotiated resolution, but those efforts were unsuccessful.

### CLAIMS FOR RELIEF

### COUNT I
**(Declaratory Judgment of Non-Infringement)**

63.     New Balance repeats and realleges the allegations set forth in paragraphs 1-62 above.

64.     This is an action for declaratory judgment and further relief against Converse pursuant to 28 U.S.C. §§ 2201 and 2202.

65.     Converse has alleged, and New Balance denies, that New Balance's PF FLYERS brand's use of the combination of a toe cap, toe bumper, and striped midsole in connection with athletic footwear infringes Converse's alleged common law rights and in its federally-registered trademark, U.S. Regis. No. 4,398,753.

66.     Converse's existing ITC claim for relief and other allegations of infringement create a reasonable apprehension by New Balance that Converse will seek to affect New

Balance's rights in the ITC Action and/or otherwise file a lawsuit against New Balance asserting trademark infringement claims under 15 U.S.C. § 1051, *et seq*.

67.    There exists an actual and justiciable controversy between New Balance and Converse as to whether New Balance infringes any of Converse's alleged trademarks.

68.    As set forth above, New Balance seeks a declaration of non-infringement for several alternative reasons:

    a.  Converse does not have the exclusive right to use a toe bumper, toe cap, and striped midsole in connection with athletic footwear;

    b.  There is no likelihood of confusion between New Balance's use of these non-source identifying elements and Converse's use of the same;

    c.  Converse ratified, acquiesced, abandoned, is estopped, or is otherwise equitably barred from seeking to enjoin the sale of footwear using PF Flyers designs.

69.    New Balance also seeks a declaration that so long as the PF Flyers products using a combination of a toe cap, toe bumper, and striped midsole bear PF FLYERS house marks, either on the footwear or in connection with its marketing or sale, the parties' products are sufficiently distinct so as to preclude any cognizable consumer confusion or harm to Converse's claimed goodwill.

## COUNT II
### (Cancellation of U.S. Reg. No. 4,398,753)

70.    New Balance repeats and realleges the allegations set forth in paragraphs 1-69 herein.

71.    This is an action pursuant to 15 U.S.C. §§ 1064 and 1119 for cancellation of Converse's trademark registration U.S. Regis. No. 4,398,753 for the combination of a toe cap, toe bumper, and striped midsole in connection with athletic footwear.

72.     The registration is subject to cancellation because the claimed features of the mark are merely ornamental and/or functional and are thus incapable of serving as a trademark, and therefore ineligible for registration under Section 2 and 45 of the Act (15 USC §§ 1052 and 1127).

73.     In the alternative, the registration is subject to cancellation because the claimed mark, as a product configuration, is not inherently distinctive and Converse did not and cannot prove that the mark has acquired secondary meaning.  Converse's use of the claimed features has not been exclusive, and there is no evidence the purchasing public have ever considered the claimed features themselves as source identifying.

74.     Registration of the claimed trademark is causing, and will continue to cause, damage to New Balance and others because it unfairly provides Converse with *prima facie* evidence of the exclusive right to use claimed trademark in connection with Converse's goods.

75.     Based on the foregoing, New Balance is entitled to an order pursuant to 15 U.S.C. § 1119 directing the Director of the Trademark Office to cancel U.S. Reg. No. 4,398,753.

WHEREFORE, New Balance respectfully requests that this Court enter judgment in its favor and against Converse:

a.     Declaring that New Balance's use of a toe bumper, toe cap, and striped midsole in connection with athletic footwear does not infringe, and at all times has not infringed, Converse's claimed rights in the same;

b.     Declaring that so long as PF Flyers athletic footwear using a combination of a toe cap, toe bumper, and striped midsole bear PF FLYERS house marks, either on the footwear or in connection with its marketing or sale, the parties' products are

sufficiently distinct so as to preclude any cognizable consumer confusion or harm to Converse's claimed goodwill.

    c.     Declaring that Converse's use of a toe bumper, toe cap, and striped midsole in connection with athletic footwear (i) lacks the requisite legal requirements to be protectable under the Lanham Act and (ii) is not entitled to registration on the Principal Register;

    d.     Ordering that U.S. Reg. No. 4,398,753 be cancelled and directing the Clerk of Court to transmit notice of the Order to the Director of the Trademark Office of the United States Patent and Trademark Office;

    e.     Awarding New Balance its costs and attorneys' fees; and

    f.     Granting New Balance such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

New Balance demands a trial by jury of all claims so triable.

****

Dated: December 23, 2014

Respectfully submitted,

_/s/ Mark S. Puzella_____
Mark S. Puzella (BBO #644850)
R. David Hosp (BBO #634091)
Sheryl K. Garko (BBO #657735)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile:  (617) 542-8906
Email:        puzella@fr.com
                  hosp@fr.com
                  garko@fr.com

Elizabeth E. Brenckman (*pro hac vice* forthcoming)
FISH & RICHARDSON P.C.
601 Lexington Avenue, 52nd Floor
New York, NY 10022
Telephone:  (212) 765-5070
Facsimile:  (212) 258-2291
Email:        brenckman@fr.com

ATTORNEYS FOR NEW BALANCE ATHLETIC
SHOE, INC.